UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ALYSON MICHELE CARRIERE                          CIVIL ACTION

VERSUS                                           NO. 18-8834

NANCY A. BERRYHILL, ACTING                       SECTION "G" (2)
COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION

### REPORT AND RECOMMENDATION

Plaintiff Alyson Michele Carriere seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for a period of disability and disability insurance benefits under Title II of the Act. 42 U.S.C. § 1382c. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2E(B).

I.    PROCEDURAL HISTORY

On March 27, 2015, Carriere filed a Title II application for a period of disability and disability insurance benefits, alleging a disability onset date of August 8, 2014. (Tr. 246). After her claim was denied at the agency level, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on February 24, 2016, in Metairie, Louisiana. (Tr. 66–92). Plaintiff appeared in person and was represented by counsel. Id. The ALJ issued a decision on May 6, 2016, finding that Carriere was not disabled. (Tr. 47–54). Plaintiff requested review of the ALJ's decision by the Appeals Council, which vacated and remanded the decision to the ALJ on March 30, 2017. (Tr. 40–43). Upon

remand, a second ALJ hearing was conducted on July 11, 2017, in Metairie, Louisiana. (Tr. 93–129). Plaintiff appeared in person and was represented by counsel. Id. The ALJ issued a decision on November 28, 2017, again finding that Carriere was not disabled. (Tr. 19–28). Plaintiff requested review of the second ALJ decision by the Appeals Council, which denied plaintiff's request on August 14, 2018, and the ALJ's decision became the Commissioner's final decision for purposes of this court's review. (Tr. 1–6).

Plaintiff filed her complaint in this court on September 21, 2018. Record Doc. No. 1. Instead of filing a memorandum of facts and law as ordered, Record Doc. No. 8, plaintiff filed a motion for summary judgment. Record Doc. No. 9. The court treats her summary judgment motion as a memorandum of facts and law regarding her instant appeal from the Commissioner's final decision. Defendant filed her reply memorandum of facts and law on March 26, 2019. Record Doc. No. 13.

## II.    STATEMENT OF THE ISSUE ON APPEAL

Plaintiff contends that the Commissioner made the following errors:

A.    The ALJ improperly relied on the vocational expert's testimony in finding that plaintiff had the residual functional capacity to perform the physical reaching requirements of her past relevant work as office manager, receptionist and insurance clerk.

B.    The ALJ erred in finding that plaintiff's headaches were not a severe impairment.

C.    The ALJ erred in finding that plaintiff did not meet the criteria of Listing 1.04.

Record Doc. No. 9-3 at p. 9.

2

III.    ALJ'S FINDINGS RELEVANT TO ISSUE ON APPEAL

The ALJ made the following findings relevant to the issue on appeal:

1.    Carriere met the insured status requirements of the Act through June 30, 2016.

2.    Plaintiff did not engage in substantial gainful activity during the period from her alleged disability onset date of April 1, 2012, through June 30, 2016.

3.    Through June 30, 2016, she had the severe impairment of degenerative disc disease of the lumbar and cervical portions of the spine.

4.    Through June 30, 2016, plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    Through June 30, 2016, Carriere had the residual functional capacity to perform sedentary work with certain postural limitations.

6.    Through June 30, 2016, plaintiff was capable of performing her past relevant work as an office manager, receptionist and insurance clerk, and this work did not require performance of work-related activities precluded by her residual functional capacity.

7.    Carriere was not under a disability from April 1, 2012, the alleged disability onset date, through June 30, 2016.

(Tr. 19–28).

IV.    ANALYSIS

A.    Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in

evaluating the evidence. Richard ex rel. Z.N.F. v. Astrue, 480 F. App'x 773, 776 (5th Cir. 2012) (citing Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005)); Stringer v. Astrue, 465 F. App'x 361, 363 (5th Cir. 2012) (citing Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002)). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Richard ex rel. Z.N.F., 480 F. App'x at 776; Stringer, 465 F. App'x at 363–64; Perez, 415 F.3d at 461. This court may not reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision. Halterman ex rel. Halterman v. Colvin, 544 F. App'x 358, 360 (5th Cir. 2013) (citing Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000)); Stringer, 465 F. App'x at 364. The Commissioner, rather than the courts, must resolve conflicts in the evidence. McCaskill v. Dep't of Health & Human Servs., 640 F. App'x 331, 332–33 (5th Cir. 2016) (citing Perez, 415 F.3d at 461); Luckey v. Astrue, 458 F. App'x 322, 324 (5th Cir. 2011) (citing Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990)); Newton, 209 F.3d at 452.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91 (1992). Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it. Joubert v. Astrue, 287 F. App'x 380, 382 (5th Cir. 2008) (citing Perez,

415 F.3d at 461). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive. Ray v. Barnhart, 163 F. App'x 308, 311 (5th Cir. 2006) (citing Perales, 402 U.S. at 390); Perez, 415 F.3d at 461.

To be considered disabled and eligible for period of disability and disability insurance benefits, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability. 20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2016). The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.[1] Id. §§

---

[1]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled. 20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled. Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence. Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To

404.1520, 416.920; <u>Alexander v. Astrue</u>, 412 F. App'x 719, 720 (5th Cir. 2011) (citing

<u>Audler v. Astrue</u>, 501 F.3d 446, 447 (5th Cir. 2007)); <u>Perez</u>, 415 F.3d at 461. The five-

step inquiry terminates if the Commissioner finds at any step that the claimant is or is not

disabled. <u>Id</u>.

The claimant has the burden of proof under the first four parts of the inquiry. If she

successfully carries this burden, the burden shifts to the Commissioner to show that other

substantial gainful employment is available in the national economy that the claimant is

capable of performing. When the Commissioner shows that the claimant is capable of

engaging in alternative employment, the burden of proof shifts back to the claimant to

rebut this finding. <u>Alexander</u>, 412 F. App'x 720–21; <u>Perez</u>, 415 F.3d at 461.

The court weighs four elements of proof when determining whether there is

substantial evidence of disability: "'(1) objective medical facts; (2) diagnoses and

opinions of treating and examining physicians; (3) the claimant's subjective evidence of

pain and disability; and (4) the claimant's age, education, and work history.'" <u>Chrisner</u>

<u>v. Astrue</u>, 249 F. App'x 354, 356 (5th Cir. 2007) (quoting <u>Wren v. Sullivan</u>, 925 F.2d

123, 126 (5th Cir. 1991)); <u>accord</u> <u>Perez</u>, 415 F.3d at 463.

---

assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. <u>Id.</u> § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

B.    Factual Background

1.    February 24, 2016 Hearing

At the first ALJ hearing, Carriere testified that she was 44 years old, right-handed, five feet, four inches tall and weighed 115 pounds. (Tr. 72). She stated that she had gained about five pounds because of her physical condition. Id. Plaintiff said that she had earned a General Education Diploma ("GED"). Id.

She testified that she had a valid driver's license and drives about two days per week. Id. Carriere stated that sometimes she is unable to drive because of headaches, neck pain, inability to turn her neck safely and numbness in her right arm and fingers. Id. Plaintiff said she has children, but they do not live with her. (Tr. 72–73). She stated that she is not required to drive her children anywhere. (Tr. 73).

Carriere testified that she last worked on August 8, 2014, about one week after her accident. Id. She stated that she received short-term disability benefits through her employer for a six-month period, which ended in early February 2015. Id. She testified that after her August 2014 car accident, she was unable to return to her job because she "wasn't able to get up." Id. She stated that it was difficult for her to function at home, drive on a daily basis and sit for an extended period of time. Id. Specifically, plaintiff said that her headaches, neck pain, problems using her right arm and numbness in her fingers contributed to her inability to return to work. Id. Carriere said that she had some issues with her ex-husband and the father of her children, which required her to be able to see her

children only in public places. (Tr. 74). Plaintiff stated that she had to take all of her medicine to be able to bring her children to these public places and she was "pretty much stuck in bed for days after." Id.

She testified that in a typical month, she has migraines two to three times per week, and they last up to 24 hours. Id. She stated that she takes Relpax for migraines and needs to lie down in a room with no noise and dim the lights as low as possible when the migraines occur. Id. Carriere said that her neck pain occurs in the middle of her neck and migrates to the lower part of her head and her right shoulder and arm. Id. She stated that she has numbness in both arms and her right fingers when she is resting or sleeping. (Tr. 74–75). She testified that because she is right-handed, the numbness affects all of her daily activities, such as typing on the computer at her job, dialing numbers on phones, carrying a purse and performing household activities. (Tr. 75). She stated that she tries to use her left hand, but she is not very adept at using it. Id. Carriere testified that her numbness causes her to drop things such as mail, paper and pens several times throughout the week. Id.

Plaintiff stated that her pain level on a scale of one to ten after taking her pain medication is a four. (Tr. 75–76). She testified that she takes her pain medication about twice per day. (Tr. 76). Carriere stated that the medication gives her relief for up to two hours, but then the pain returns. Id. She stated that the medicine wears off completely after three to four hours. Id. Plaintiff testified that her pain level is a seven or eight out of ten

after her medicine wears off. Id. She said that she sits in a hot bathtub and applies ice to her body to manage the pain. Id.

Carriere testified that she cannot raise her right arm over her head. Id. She stated that she cannot move her neck side to side or her head up and down completely. (Tr. 77). Plaintiff said that reading, watching television, being upright and holding her neck at certain angles aggravates her pain. Id. Carriere stated that her prescription pain medication makes her drowsy and she needs to take about two naps per day for an hour and a half each. Id.

Plaintiff testified that Dr. Daniel Trahant is her treating physician for back and neck pain. Id. She said that she began seeing Dr. Trahant the month after her accident. (Tr. 78). Carriere stated that the heaviest weight she can lift with both hands is five to ten pounds. Id. She testified that she can stand for 15 to 20 minutes before she needs to take a break. Id. She testified that if she were allowed to alternate between sitting and standing during an eight-hour period, she could stand for one to two hours before needing to take a break. Id. Plaintiff stated that she can walk approximately one block before she needs to take a break. Id. She said that she can sit in a straight chair for about 15 minutes before she needs to alternate positions. Id.

Carriere testified that she lives with her husband. (Tr. 79). She stated that her children do not live with her. Id. Plaintiff said that her husband and mother help her on a daily basis with activities such as cooking, cleaning, laundry and washing her hair. Id. She

said that she cannot do any cooking or cleaning by herself, except that she can make a small snack to eat. Id. Carriere said that she no longer has any hobbies, but she used to enjoy cooking with her husband and exercising. Id.

Plaintiff testified that she can no longer work because she does not feel like she is capable of going to work and performing daily work activities. Id. She said that she has trouble getting out of bed and getting out of the house. (Tr. 79–80). Carriere testified that her headaches make her unable to know when she is capable of driving. (Tr. 80). She said that she could not be "up for a certain amount of hours without experiencing the pain and being on all this medication" prescribed to her. Id.

Carriere testified that she recently settled a lawsuit through mediation in January 2016. Id. She stated that the lawsuit settled for $80,000, before attorney's fees and medical costs. Id. She stated surgery had been recommended for her, but the money received in the settlement was not enough to pay for the surgery. (Tr. 80–81). Plaintiff testified that Dr. Trahant told her that he was not seeing any improvement in her physical condition and strongly recommended that plaintiff have the surgery when she is able to afford it. (Tr. 81). Plaintiff said that she settled the lawsuit for less than the cost of the surgery because of the limits of the defendant's insurance policy. Id.

Carriere testified that she has health insurance through her husband, but her insurance is not enough to cover the entire cost of the recommended surgery, based on a pre-existing condition and/or exhaustion of policy limits. Id. Plaintiff stated that she has

never tried epidural steroid injections because she is "very scared to death of needles," and she had anxiety about using needles in light of her son's drug overdose. Id.

Plaintiff stated that she has eight-year-old twin children, a 21-year-old daughter and used to have a son. (Tr. 82). Carriere stated that the twins lived with her until June 2014, when she and the twins' father "got into a bad dispute" regarding plaintiff's current husband. Id. She said that she hopes to get custody of the twins back soon; however, she "got tired of battling" with the twins' father, who is an attorney. Id. She stated that she lost custody of the twins after the twins' father brought before the court a domestic accusation involving plaintiff's current husband. Id. Plaintiff testified that her current husband has a past criminal record, which the court took into consideration before switching custody from plaintiff to the twins' father. (Tr. 83). Carriere testified that her mother lives five minutes away from her, but often stays with plaintiff. Id.

Plaintiff said that Dr. Trahant recommended that she receive epidural steroid injections "in the beginning" but after some time passed, Dr. Trahant did not think the injections would be effective. (Tr. 83–84). Carriere testified that her condition is "gradually getting worse, not any better." (Tr. 84).

Plaintiff stated that she has numbness in the three middle fingers of her hand. Id. She said the pain is primarily in the tips of the fingers but also spreads throughout the fingers. Id. Carriere testified that she underwent a nerve conduction study conducted by Dr.

11

Trahant, and the results reflected problems in her right side. Id. Plaintiff testified that the study involved use of multiple needles. Id.

Plaintiff testified that she worked for her friend's house-cleaning business from 2001 to 2003, earning between $11,000 and $12,000 per year. (Tr. 84–85). She stated that in 2004, she started working for the Louisiana State University Health Care Network in the contract management department. (Tr. 85). Carriere said she was responsible for reviewing all contracts between the doctors and different facilities. Id. She testified that the job required "a lot of typing on a computer, research work." Id. Plaintiff stated that she had a boss, but the job was fairly self-sufficient. Id.

Carriere said that she also worked for Tenet Health Care Systems at Memorial Medical Center as a patient liaison and was responsible for obtaining insurance approvals for patients. (Tr. 86). She said that her job with Tenet ended after Hurricane Katrina. Id. Plaintiff testified that in 2006 she held several self-employed jobs, including house cleaning jobs. Id. She stated that she got a job with Pyramid Advisors Limited/Marriott in 2007, as a food and beverage manager. (Tr. 86–87).

She stated that in 2012 she was hired by Ochsner as manager of a diagnostic center in Kenner, Louisiana, which specializes in outpatient procedures and testing. (Tr. 87). Plaintiff testified that she was responsible for managing 11 employees. Id. She stated that she was injured on her way to her Ochsner job. Id. She stated that she did not have long-term disability benefits. Id.

2.    July 11, 2017 Hearing

At the second hearing, Carriere testified that she was 45 years old, five feet, four inches tall and weighed 103 pounds. (Tr. 102). Plaintiff stated that the reason for her loss of weight since the first hearing was her daily pain and headaches, which make her nauseous and decrease her appetite. Id. She repeated that she had earned her GED. Id. Carriere testified that she rarely is able to drive a car, because she cannot move her neck. Id.

She stated that her condition had gotten "a lot worse" since the first hearing. Id. Plaintiff said that she has headaches "every single day" and "[m]igraines in the back of my head that goes (sic) into my ears and make my ears ring." (Tr. 102–03). She testified that she has constant spasms in her neck and that the problems with her right arm and side had spread to her left arm and shoulder. (Tr. 103). Plaintiff said she has trouble sleeping at night because of her pain, lack of circulation in her arms while lying down and the inability to "do anything." Id.

She stated that the daily activities that had become more difficult since the first hearing include driving, cooking her own food, bathing and washing her hair. Id. Plaintiff testified that she cannot hold a blow dryer and someone else helps her wash her hair and hold the blow dryer. Id.

Carriere testified that on a scale of zero to ten, zero being no pain and ten being pain that would prompt a visit to the emergency room, her headache pain level is a high seven

or eight while on her pain medication. Id. She stated that her medication merely "takes the edge off" and sometimes her headache pain "can last for two to three weeks at a time." Id. Plaintiff said she has a headache "every single day." (Tr. 104). She stated that she manages her headache pain by lying down in a dark room and using heating pads and cold packs on the back of her head. Id. Carriere stated that she lies down with heating pads or cold packs for the majority of the daytime hours, or more than half of an average nine-to-five workday. Id.

Plaintiff stated that since the first hearing, her doctors had prescribed her the medications Flexeril and Robaxin. Id. Carriere said that her new medications help "take the edge off at first," but they do not last. Id. She testified that when her headaches persist for weeks at a time, she takes oral steroids. Id.

Carriere stated that since the first hearing she had stopped carrying a purse because purses aggravated and pulled on her shoulder and neck. (Tr. 104–05). She stated that standing bothers her because she needs to hold up her neck. (Tr. 105). Plaintiff testified that the most comfortable position for her is either lying down or sitting in a position where she can rest the back of her head against something, such as a wall. Id.

She stated that on a typical day, she goes back and forth between her sofa and bedroom and watches television. Id. Carriere said that she does not leave the house often, and when she does it is usually when her mother picks her up to bring her to her mother's house to eat meals. Id. Plaintiff testified that her minor children are still living with her ex-

husband, who brings the children to plaintiff's house a few times a week. (Tr. 105–06). She said that when her children come over they sit, talk and watch movies together, and sometimes the children play video and computer games by themselves. (Tr. 106).

Carriere testified that when she begins to use her fingers, "they go numb." Id. She stated that she loses the feeling in her fingers when using her phone. Id. Plaintiff said that she is unable to hold her arms overhead. She said that she previously was able to use her left hand and arm, but now the left side is giving her more trouble. Id.

Plaintiff stated that she has not received the surgery recommended by her doctors because she is afraid of the surgical procedure and needing people to care for her during her recovery. (Tr. 107). She said that she hoped her condition would improve, but instead her condition has gotten "ten times worse" than before. Id. She stated that she also was unsure whether she would have health insurance much longer based on her separation from her current husband. Id. Plaintiff said that her accident had "taken a toll" on her marriage. Id. Carriere testified that her physical condition places her "in a really bad place physically, mentally." Id. She stated that the pain wears her out, makes her incapable of leaving the house and doing activities with her children, erodes her self-esteem and negatively impacts her marriage. Id.

She testified that she is unable to return to her job as department manager because of her issues being upright during the workday and using her arms and fingers to use the phone and complete other tasks. (Tr. 107–08). Carriere said that her constant headaches

lasting several days and her inability to drive to work and complete a full workday also contribute to her inability to return to this job. (Tr. 108). She testified that she is unable to return to her job as contract clerk because her neck and arm pain, headaches and the ringing in her ear affect her concentration and ability to type on the computer and use the phone. Id.

Plaintiff stated that she lives alone, but her 23-year-old daughter comes over to help wash plaintiff's hair. Id. Carriere testified that she has problems getting dressed in the morning, but she wears "a lot of slip on stuff," such as warm-ups, t-shirts and clothing without buckles or buttons. Id. She stated that she brings the clothing items "down as low as I can to slip my arms through and put it over." (Tr. 109).

Carriere testified that she has not tried epidural steroid injections since the first hearing, because she is still "deathly afraid of needles." Id. She stated that Dr. Trahant mentioned that her failure to get the injections immediately following her accident may affect their effectiveness at this later stage of plaintiff's physical condition. Id. Plaintiff said that she had heard "mixed stories" about the injections, where sometimes they would not work, or would only work for one week or six months. Id.

Plaintiff testified that taking oral steroids lessens her headache pain for the headaches lasting more than two weeks. Id. She stated that she called Dr. Trahant to ask to be "put back on" oral steroids, but Dr. Trahant told her "it was too soon to take the steroid that close." (Tr. 109–10). She said that Dr. Trahant advised her that if the headache

16

pain becomes excruciating, she should go to the emergency room. (Tr. 110). She stated that Dr. Trahant also recommended that she visit a neurosurgeon. Id. Plaintiff said that oral steroids decreased the length of her headaches from several weeks to two days. Id. She said that the headache was still present when she took the oral steroids, "but it wasn't as intense." Id.

C.    Vocational Expert Testimony

1.    February 24, 2016 Hearing

A vocational expert, Thomas Meunier, testified at the first hearing. (Tr. 88). Meunier testified that plaintiff's food and beverage manager job consisted of light, skilled work. (Tr. 89). He stated that plaintiff's contract clerk job consisted of sedentary, skilled work. Id. Meunier said that plaintiff's insurance clerk job consisted of sedentary, semi-skilled work. Id. He stated that Carriere's job as a housekeeper consisted of light, unskilled work. Id.

The ALJ posed a hypothetical of a person with the same age, education and past relevant work experience as Carriere who can lift 20 pounds occasionally; lift and/or carry 10 pounds frequently; sit, stand, and walk up to six hours each in an eight-hour workday; and reach overhead with the bilateral upper extremities frequently. (Tr. 89–90). Meunier testified that such a person could perform all of plaintiff's past work. (Tr. 90).

The ALJ posed a second hypothetical of a person with the same age, education and past relevant work experience as Carriere who can occasionally lift and carry 10 pounds; frequently lift and carry less than 10 pounds; stand and walk for two hours in an eight-hour

workday; sit for six hours in an eight-hour workday; never climb ladders, ropes and scaffolds; never reach overhead with the dominant upper extremity; and occasionally reach overhead with the non-dominant upper extremity. Id. Meunier testified that such a person could perform all of plaintiff's past sedentary jobs, including office manager, contract clerk and insurance clerk. Id.

The ALJ posed a third hypothetical of a person with the same age, education and past relevant work experience as Carriere who was required to lie down and be off-task for 15% of the workday, at unscheduled intervals. (Tr. 90–91). Meunier testified that such a person would not be able to maintain any type of competitive employment. (Tr. 91).

2.   July 11, 2017 Hearing

The same vocational expert, Thomas Meunier, testified at plaintiff's second hearing. (Tr. 111). Meunier testified that plaintiff's past job as a food and beverage manager consisted of light, skilled work. (Tr. 114). He stated that plaintiff's past job as office manager consisted of sedentary, skilled work. Id. Meunier testified that plaintiff's past jobs as insurance clerk and receptionist consisted of sedentary work and required frequent handling, fingering and reaching. (Tr. 121–22).

The ALJ posed a hypothetical of a person with the same age, education and past relevant work experience as Carriere who can occasionally lift and carry 10 pounds; frequently lift and carry less than 10 pounds; stand and walk for two hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally reach overhead with the

18

left non-dominant extremity; and cannot reach with the dominant upper extremity or climb ladders, ropes or scaffolds. (Tr. 122). Meunier testified that based on his professional experience, such a person could only perform plaintiff's past sedentary work, including office manager, insurance clerk and receptionist. (Tr. 122, 125–26). Meunier noted that these jobs require "frequent reaching in any direction," but based on the hypothetical individual's ability to occasionally reach overhead with the non-dominant extremity, the individual's ability to perform these jobs would not be hindered. (Tr. 123).

The ALJ posed a second hypothetical of a person with the same age, education and past relevant work experience as Carriere who can occasionally lift and carry 10 pounds; frequently lift and carry less than 10 pounds; stand and walk for two hours in an eight-hour workday; sit for six hours in an eight-hour workday; occasionally reach in all directions, including overhead; frequently balance, stoop, kneel and crouch; never climb ladders, ropes or scaffolds; and never crawl. (Tr. 123–24). Meunier testified that such a person could not perform any of plaintiff's past work. (Tr. 124). Meunier stated that such an individual could perform the semi-skilled, sedentary job of information clerk, defined as a person "who sits in a lobby and direct[s] people where to go." Id. He testified that an information clerk position requires occasionally reaching, handling and fingering. Id. Meunier said that there is some transferability of skills at the low, semi-skilled level based on plaintiff's past work scheduling and dealing with patients. Id. Meunier stated that this individual could also perform the unskilled, sedentary job of credit authorizer, also known as call-out operator.

19

Id. Meunier stated that a credit authorizer is required to engage in occasional reaching, handling and fingering. Id. Meunier stated that this individual could also perform the sedentary, unskilled job of election clerk, which requires occasional reaching, handling and fingering. (Tr. 125).

Meunier testified that if the individual in the second hypothetical had the added limitation of occasional feeling with the fingers bilaterally; avoidance of concentrated exposure to wetness, humidity, noise, vibration, fumes, odor dust, gases and hazardous machinery; and no climbing of ramps or stairs, this person's ability to perform the above-mentioned sedentary jobs would not be affected. (Tr. 127).

The ALJ posed a third hypothetical of a person with the same age, education and past relevant work experience as Carriere who is unable to withstand the rigors of working an eight-hour day or a 40-hour week, such that this person is likely to miss 15% of work time. (Tr. 125). Meunier stated that such a person would be precluded from maintaining any competitive employment. Id.

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the evidence in both of her decisions. (Tr. 19–28, 47–54). I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

1. The ALJ properly relied on the vocational expert's testimony in finding that plaintiff could perform the physical reaching requirements of her past sedentary work as office manager, receptionist and insurance clerk.

In her first assignment of error, plaintiff argues that the ALJ erred at Step Four of the sequential evaluation in finding that plaintiff could perform her past relevant sedentary work as office manager, receptionist and insurance clerk, because the Dictionary of Occupational Titles identifies these jobs as requiring "frequent" reaching and conflicts with the ALJ's residual functional capacity finding that plaintiff could not engage in overhead reaching with the dominant upper extremity, but could engage in occasional overhead reaching with the left, non-dominant upper extremity. Record Doc. No. 9-3 at p. 11; (Tr. 23).

At the second hearing, the vocational expert testified in response to the ALJ's first hypothetical that an individual of the same age, education and past relevant work experience as Carriere, with limitations of no overhead reaching with the dominant upper extremity and occasional overhead reaching with the left, non-dominant extremity, could perform all of Carriere's past sedentary work, including office manager, receptionist and insurance clerk. (Tr. 122). The Dictionary of Occupational Titles identifies the reaching requirement for these jobs as "Frequently - Exists from 1/3 to 2/3 of the time." DICOT 169.167-034 (G.P.O.), 1991 WL 647430; DICOT 237.367-038 (G.P.O.), 1991 WL 672192; DICOT 219.387-014 (G.P.O.), 1991 WL 671978. When prompted by the ALJ

to explain how an individual with overhead reaching limitations could perform jobs involving frequent reaching, the vocational expert testified that the Dictionary of Occupational Titles is not so specific as to "parse out" how much overhead reaching is required in a given job as opposed to reach involving simple extension of the arm with no overhead component. (Tr. 123). The expert opined that an individual with overhead reaching limitations would still be able to perform plaintiff's past sedentary work. Id. The ALJ ultimately made a residual functional capacity finding that incorporated the reaching limitations of the first hypothetical: no overhead reaching with the dominant upper extremity and occasional overhead reaching with the left, non-dominant upper extremity. (Tr. 23).

Plaintiff argues that the overhead reaching limitations incorporated in the ALJ's residual functional capacity finding were based on vocational expert testimony that was "in direct conflict with the DOT and its companion manual." Record Doc. No. 9-3 at p. 11. Although the Commissioner may take notice of the reliable job information available from various governmental and other publications, including the Dictionary of Occupational Titles, she is not bound by it, but may rely on vocational expert testimony. 20 C.F.R. § 404.1566(d), (e); Carey v. Apfel, 230 F.3d 131, 145 (5th Cir. 2000); Vaughan v. Shalala, 58 F.3d 129, 132 (5th Cir. 1995); Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990). Accordingly, even if the vocational expert testimony differs from the published job data, the testimony may constitute substantial evidence upon which the

ALJ can rely in appropriate cases. Carey, 230 F.3d at 145–47. Thus, the ALJ was entitled to rely on the vocational expert's testimony in making her residual functional capacity finding and was not strictly bound by the language of the Dictionary of Occupational Titles.

Moreover, the vocational expert's testimony and the ALJ's ultimate residual functional capacity finding are not in direct conflict with the Dictionary of Occupational Titles' reaching requirements for plaintiff's past sedentary jobs. As to reaching, the ALJ's residual functional capacity finding only limited plaintiff's overhead reaching abilities. As the vocational expert testified, the Dictionary of Occupational Titles does not specify the type of reaching required in the sedentary positions of office manager, receptionist and insurance clerk. The Dictionary of Occupational Titles does not indicate that plaintiff's past sedentary jobs require frequent overhead reaching; rather, it states that these jobs require frequent reaching in general. Considering an individual with some overhead reaching ability in the non-dominant upper extremity and unlimited non-overhead reaching ability, the vocational expert concluded that such a person could perform plaintiff's past sedentary work. (Tr. 123). Thus, the vocational expert's testimony was not in conflict with the reaching requirement language for plaintiff's past sedentary jobs in the Dictionary of Occupational Titles, and the ALJ properly relied upon the expert's testimony in determining the reaching limitations in her ultimate residual functional capacity finding.

Moreover, even if the expert's testimony had been in conflict with the Dictionary of Occupational Titles, such a conflict "is greatly mitigated by the vocational expert's specific

testimony that [plaintiff] could perform the identified jobs" of office manager, receptionist and insurance clerk. Carey, 230 F.3d at 146. For the foregoing reasons, the ALJ properly relied on the vocational expert's testimony in reaching her residual functional capacity finding. Plaintiff's first assignment of error is without merit.

      2. The ALJ properly found that plaintiff's headaches are not a severe impairment.

In her second assignment of error, plaintiff argues that the ALJ should have found her headaches to be a severe impairment. Record Doc. No. 9-3 at pp. 14–16. To support her assertion, plaintiff cites her subjective complaints to her treating physician Dr. Trahant, a diagnosis of severe headaches by Dr. Trahant, a function report submitted to the Commissioner in which plaintiff indicates that her headaches interfered with her ability to focus and concentrate and her hearing testimony that the headaches interfere with her activities of daily living. (Tr. 103–04, 292, 399, 721–22, 729, 739, 756, 761).

At Step Two of the sequential evaluation, the ALJ must determine which of the claimant's impairments are severe. An impairment is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 416.922. Under Fifth Circuit precedent, "[a]n impairment can be considered as not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." Loza v. Apfel, 219 F.3d 378, 391 (5th Cir. 2000) (emphasis added) (quoting Stone v. Heckler, 752 F.2d 1099, 1101 (5th Cir. 1985)).

Although the record may contain a diagnosis of a condition such as headaches, "mere diagnosis of [an impairment] does not establish a severe impairment or the existence of a functional limitation." Schultz v. Astrue, 2010 WL 2733605, at *9 (E.D. La. June 8, 2010), report & recommendation adopted, 2010 WL 2733565 (E.D. La. July 8, 2010).

In her decision, the ALJ cited the relevant standard for severity and found that plaintiff's headaches were not a severe impairment at Step Two. (Tr. 21–22). Subjective complaints must be corroborated by objective medical evidence. Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001). The medical record contains reports from a series of examinations performed on plaintiff by her treating physicians between August 2014 and July 2017, which detail plaintiff's history of headaches and the physicians' prescribed treatment plans for this condition. On September 23, 2014, Dr. Trahant recommended epidural steroid injections to alleviate the pain resulting from plaintiff's posterior headaches and noted that plaintiff's prescribed medication "was helpful in breaking her headache." (Tr. 391). On December 4, 2014, Dr. Trahant again recommended epidural steroid injections, following plaintiff's reports that the benefits of the prescribed medications had waned. (Tr. 396). On February 4, 2015, Dr. Trahant noted that plaintiff had not proceeded with the recommended injections, based on a fear of needles and history of a family member's drug overdose. (Tr. 398). On April 13, 2015, Dr. Trahant noted that plaintiff had decided against receiving the recommended injections. (Tr. 399). On August 7, 2015, Dr. Lucien S. Miranne, Jr. examined plaintiff and recommended that she receive spinal surgery. (Tr. 423).

On October 1, 2015, plaintiff reported to Dr. Trahant that her prescribed pain medication helped to alleviate her headache symptoms. (Tr. 729). On February 18, 2016, observing that the degree of pain in plaintiff's posterior headaches had not changed, Dr. Trahant recommended that plaintiff consult a neurosurgeon for possible neurosurgical intervention. (Tr. 739).

Dr. Trahant performed a neurological evaluation of plaintiff on February 15, 2017, discussed plaintiff's candidacy for spinal surgery to remedy her posterior headaches, and noted that plaintiff stated "she was not ready for that step yet." (Tr. 756–57). Dr. Trahant performed a follow-up neurological evaluation of Carriere on June 30, 2017, during which plaintiff reported a "continual headache for the past nine days" that was not alleviated by plaintiff's prescribed pain medications. (Tr. 761). Dr. Trahant noted that the nine-day headache was "a fairly atypical situation for her, and usually her headaches do not last quite this long." Id. Dr. Trahant concluded that the extended headache was a result of a muscle contraction related to plaintiff's cervical disc disease. Id. In light of the source of plaintiff's headaches and the ineffectiveness of the prescribed medications in alleviating the headaches, Dr. Trahant concluded that plaintiff was "a strong candidate for cervical spinal surgery," and recommended that plaintiff visit Dr. Andrew Todd for his opinion "concerning the advisability and potential success of surgery." Id. Plaintiff visited Dr. Todd for an examination on July 10, 2017. (Tr. 765–68). Dr. Todd's treatment plan for plaintiff's

headaches recommended that plaintiff receive spinal surgery or epidural steroid injections. (Tr. 768).

In her hearing testimony, plaintiff stated that Dr. Trahant had "highly recommend[ed]" that she receive surgery to alleviate her headaches, based on his observations that her condition was not improving with prescribed pain medication. (Tr. 81). She testified that she did not receive the surgery recommended by Drs. Trahant and Todd because she is afraid of the surgery itself and needing people to care for her afterward, unsure whether her husband's health insurance would cover the full cost of the procedure and hoped the condition would improve on its own. (Tr. 81, 107). In addition, plaintiff testified that she has not received the epidural steroid injections recommended by Drs. Trahant and Todd because she is "very scared to death of needles," and that they give her anxiety after having a son who overdosed from drugs using needles. (Tr. 81). Plaintiff testified that she took oral steroids for her headaches, which helped lessen the pain of headaches lasting more than two weeks. (Tr. 109). She stated that although headaches were still present after taking the oral steroids, "it wasn't as intense." (Tr. 110).

Dr. Trahant noted that plaintiff's atypical, long-term headaches caused her to be "nonfunctional, including activities of daily living" and were not alleviated by plaintiff's prescribed pain medications. (Tr. 761). However, even if plaintiff's atypical headaches had been found to be a severe impairment by the ALJ, plaintiff's utter disregard of her treating physician's prescribed treatment plans between August 2014 and February 2017 precludes

a finding of disability for this condition. After numerous and extensive examinations of plaintiff, Dr. Trahant concluded that plaintiff's most painful and extended headaches were a result of a muscle contraction related to plaintiff's cervical disc disease. (Tr. 761). During the course of plaintiff's medical treatment, multiple physicians strongly and consistently recommended spinal surgery and/or epidural steroid injections to mitigate the atypical, long-term headaches that prescribed medication failed to alleviate. "If an impairment reasonably can be remedied or controlled by medication or therapy, it cannot serve as a basis for a finding of disability." Johnson v. Bowen, 864 F.2d 340, 348 (5th Cir. 1988). "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987). A claimant's failure to follow the prescribed treatment of her medical sources without good reason is grounds for a finding that a claimant is not disabled. 20 C.F.R. § 404.1530(b). Fear of surgery and needles, concern about being a burden on others post-surgery, aspirational hopes that a medical condition will improve and potential inability to cover the full cost of surgery through health insurance are not examples of "good reasons" for failing to follow a medical source's prescribed treatment plan. See 20 C.F.R. § 404.1530(c).

Plaintiff's hearing testimony, her subjective reports to doctors and the objective medical evidence reflect that her headaches were mitigated by prescribed pain medication. The record also reflects that plaintiff ignored the advice of multiple physicians in failing to receive surgery and/or epidural steroid injections to alleviate her atypical, long-term

headaches. Based on this evidence, the ALJ did not err in finding that plaintiff's typical headaches were non-severe and did not significantly limit plaintiff's physical or mental ability to do basic work activities. As to plaintiff's atypical headaches, even if these were found to be severe by the ALJ, plaintiff's refusal to follow her treating physicians' treatment plans without good reason precludes a finding of disability.

Moreover, Plaintiff's argument concerning severity of her headaches at Step Two is unavailing because the ALJ's opinion clearly reflects that she proceeded beyond Step Two to consider <u>all</u> of Carriere's claimed impairments – even the non-severe impairment of headaches – in her assessment of Carriere's disability. <u>Dise v. Colvin</u>, 630 F. App'x 322, 324 (5th Cir. 2015); (Tr. 456–61). Having found that Carriere had a severe impairment, the ALJ proceeded through subsequent steps of the evaluation, considered all of the evidence concerning plaintiff's medically determinable impairments – both severe and non-severe – and found at Step Four of the sequential evaluation that she is capable of performing her past sedentary work, with certain postural limitations. (Tr. 23–27).

Thus, Carriere's case "'did not turn on whether or not [Carriere's headache] impairment was severe but on subsequent steps in the analysis." <u>Dise</u>, 630 F. App'x at 324 (citing <u>Chaparro v. Bowen</u>, 815 F.2d 1008, 1011 (5th Cir. 1987)). The ALJ's failure to find at Step Two that Carriere's headaches were severe is irrelevant and non-prejudicial to her. Because substantial evidence supports the ALJ's finding that plaintiff's

headaches are not severe for the reasons cited in the ALJ's opinion, plaintiff's second assignment of error is meritless.

> 3. The ALJ properly found that plaintiff's impairments did not meet the criteria of Listing 1.04.

In her third assignment of error, plaintiff argues that the ALJ erred at Step Three of the sequential evaluation in failing to find that plaintiff's impairments met Listing 1.04. Whether an impairment or combination of impairments meets a listing is a medical question that can be answered <u>only</u> by medical evidence. 20 C.F.R. §§ 404.1526(b), 416.926(b); <u>McCuller v. Barnhart</u>, 72 F. App'x 155, 158 (5th Cir. 2003); <u>Selders v. Sullivan</u>, 914 F.2d 614, 619 (5th Cir. 1990); <u>McKnight v. Astrue</u>, 2008 WL 4387114, at *3 (W.D. La. Aug 15, 2008), <u>report & recommendation adopted</u>, 2008 WL 5746939 (W.D. La. Sept. 23, 2008), <u>aff'd</u>, 340 F. App'x 176 (5th Cir. 2009). "The specified medical criteria [of a listing] are designed to be demanding and stringent because they lead to a presumption of disability[,] making further inquiry unnecessary." <u>Anderson v. Astrue</u>, 2011 WL 3331821, at *6 (N.D. Tex. July 11, 2011), <u>report & recommendation adopted</u>, 2011 WL 3347857 (N.D. Tex. July 29, 2011) (citing <u>Sullivan v. Zebley</u>, 493 U.S. 521, 532 (1990); <u>Falco</u>, 27 F.3d at 162). "For a claimant to qualify for benefits by showing that [her] unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to <u>all</u> the criteria for the one most similar listed impairment." <u>Zebley</u>, 493 U.S. at 531 (citing 20 C.F.R. § 416.926(a); SSR 83-19, at 91) (emphasis in

original). "The claimant must provide medical findings that support each of the criteria for the equivalent impairment determination." Selders, 914 F.2d at 619.

Listing 1.04, as it was in effect on the date of the ALJ's decision, requires a disorder of the spine or the spinal cord with (1) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or (2) spinal arachnoiditis; or (3) lumbar spinal stenosis. 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (2017). The ALJ found that plaintiff did not meet Listing 1.04 "because the medical records do not demonstrate that [plaintiff's] impairment results in nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis as contemplated by the listing." (Tr. 23).

Plaintiff argues that her medical records indicate that her impairments meet the criteria of Listing 1.04. Record Doc. No. 9-3 at p. 17. To support her argument, plaintiff cites a report by Dr. Miranne stating that plaintiff had compression of the right C6 nerve root. (Tr. 662). However, as stated above, plaintiff's physicians recommended that she receive spinal surgery, with Dr. Todd recommending that plaintiff receive "an anterior cervical fusion from C4–C7," and Dr. Trahant stating that plaintiff was a candidate for spinal surgery "at the C5–6 and C6–7 levels," which would encompass the C6 compressed nerve root referenced by Dr. Miranne. (Tr. 756, 768). As noted in the second assignment

of error, plaintiff's failure to follow her physicians' treatment plans to receive surgery without good reason is grounds for a finding that a claimant is not disabled. 20 C.F.R. § 404.1530(b).

Moreover, plaintiff's argument that her impairment rises to the level of a listed impairment as to the other criteria in Listing 1.04 is not substantially supported by the medical evidence. Independent medical evaluator Dr. David W. Aiken, Jr. reviewed plaintiff's medical records from August 2014 through June 2015, and performed a physical examination on plaintiff on December 1, 2015. (Tr. 668–76). Dr. Aiken states that plaintiff "point[ed] to the lower lumbar area as the painful part" and reported that "she cannot bend further than 40 degrees without severe pain." (Tr. 672–73). Upon examination of plaintiff, Dr. Aiken noted that "[s]traight leg raising causes a 'pulling' sensation in the low back on both the right and left sides; in both the sitting and supine positions," but does not state that either the supine or sitting test was positive, as required by Listing 1.04 for a claimant with nerve root compression with involvement of the lower back. (Tr. 673).

Dr. Aiken reviewed surveillance video of plaintiff's daily activities during April and May 2015, and noted that on April 7, 2015, "the patient easily bends over and flexes her lumbar spine to about 80 degrees which is more than she demonstrated [the day of Dr. Aiken's physical examination]." (Tr. 674). In addition, Dr. Aiken observed that on May 10, 2015, "the patient flexes her lumbar spine fully to 90 degrees without any hesitation or apparent pain" and "repeats this motion almost immediately . . . without any evident pain."

32

(Tr. 674–75). Dr. Aiken concluded that "the video surveillance shows that the patient is capable of far more motion than she demonstrated to me during this examination today. This indicates that the patient is exaggerating her complaints." (Tr. 675). Dr. Aiken's findings indicate that plaintiff did not have limitation of motion of the spine, as required by Listing 1.04 for a claimant with nerve root compression.

In addition, Dr. Trahant noted in a December 4, 2014 evaluation that plaintiff's "[r]eflexes were normally reactive and symmetrical in both upper and lower extremities" and that her "[s]trength was normal in both upper extremities, without evidence of any atrophy." (Tr. 396). Dr. Trahant's observations as to normal muscle strength and reflexes remained unchanged throughout his treatment of plaintiff, as noted in his April 13, 2015; October 1, 2015; February 15, 2017; and June 30, 2017 evaluation reports (Tr. 399, 729, 756, 761). Similarly, Dr. Aiken observed that "[t]here is not weakness or sensory loss found in either upper extremity . . . the plaintiff has a full range of motion of both elbows, wrists, and hands without pain." (Tr. 672). The objective medical evidence shows that plaintiff's nerve root compression was not characterized by atrophy/muscle weakness or reflex loss as required under Listing 1.04 for a claimant with nerve root compression.

For these reasons, plaintiff's argument that her impairment meets the criteria of Listing 1.04 is not substantially supported by the objective medical evidence. Plaintiff's third assignment of error is without merit.

As she is required to do, the ALJ considered all of plaintiff's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the

objective medical evidence and other evidence in plaintiff's records. Luckey, 458 F. App'x at 326 (citing Scott, 770 F.2d at 485); Perez, 415 F.3d at 462. The ALJ is bound to explain her reasons for rejecting a claimant's subjective complaints, but "is not required to 'follow formalistic rules in [her] articulation.'" Hernandez v. Astrue, 278 F. App'x 333, 339 (5th Cir. 2008) (quoting Falco v. Shalala, 27 F.3d 160, 164 (5th Cir. 1994)). The ALJ has the responsibility to evaluate the credibility of the witnesses, Masterson v. Barnhart, 309 F.3d 267, 272 (5th Cir. 2008) (quoting Falco, 27 F.3d at 164), and the consistency between the witness's testimony and the other evidence in the record. Thus, the ALJ's credibility evaluation is entitled to considerable deference by this court. McKnight v. Astrue, 340 F. App'x 176, 181 (5th Cir. 2009) (citing Newton, 209 F.3d at 459); Bedford v. Astrue, 236 F. App'x 957, 962 (5th Cir. 2007) (citing Newton, 209 F.3d at 459). The ALJ's explanation of her reasons for finding plaintiff not entirely credible or that plaintiff's testimony is inconsistent with the evidence as a whole is all that is required. Undheim v. Barnhart, 214 F. App'x 448, 450–51 (5th Cir. 2007) (citing 20 C.F.R. § 404.1529(c); Falco, 27 F.3d at 164); James J. Flanagan Stevedores, Inc. v. Gallagher, 219 F.3d 426, 430 & n.8 (5th Cir. 2000) (citing Falco, 27 F.3d at 163); Godbolt v. Apfel, 1999 WL 179476, at *9 (E.D. La. Mar. 31, 1999). The ALJ complied with these standards in the instant matter.

The ALJ need not address each aspect of the record in detail. "[T]here will always be some evidence that is not specifically discussed in the Commissioner's decision. [The court's] review is limited to examining whether the decision to deny benefits is supported by substantial evidence in the record, and it is here. Likewise, the Commissioner used the proper

legal standards to evaluate the evidence, and the ALJ adequately resolved inconsistencies in the record." Giles, 433 F. App'x at 251.

CONCLUSION

The ALJ used the appropriate legal standards to weigh and resolve conflicts in the medical opinion evidence. Her reliance on the vocational expert's testimony in reaching her residual functional capacity finding that Carriere can perform the reaching requirements of her past sedentary work, with certain postural limitations; her finding that Carriere's headaches are not a severe impairment; and her finding that plaintiff's impairments do not meet the criteria of Listing 1.04 are supported by substantial evidence.

**RECOMMENDATION**

For the foregoing reasons, **IT IS RECOMMENDED** that plaintiff's appeal be denied and her complaint be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[2]

---

[2] Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen (14) days.

New Orleans, Louisiana, this _____19th_____ day of June, 2019.


_____
JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE